# EXHIBIT 4

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           WESTERN DIVISION

 3      BYRON E. ADAMS,              )      Docket No. 12 C 50297
                                     )
 4                   Plaintiff,      )      Rockford, Illinois
                                     )      Tuesday, January 13, 2015
 5           v.                      )      10:20 o'clock a.m.
                                     )
 6      M.D. S. CULLINAN,            )
                                     )
 7                   Defendant.      )

 8                       TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE IAIN D. JOHNSTON
 9
        APPEARANCES:
10
        For the Plaintiff:          SCHIFF HARDIN LLP
11                                  (233 S. Wacker Drive,
                                     Suite 6600,
12                                   Chicago, IL  60606) by
                                    MS. TAL C. CHAIKEN
13
        For the Defendant:          WELDON-LINNE and VOGT
14                                  (20 S. Clark Street,
                                     Suite 2050,
15                                   Chicago, IL  60603) by
                                    MS. BETHANY S. CAMPBELL
16
        Court Reporter:            Mary T. Lindbloom
17                                 327 S. Church Street
                                   Rockford, Illinois  61101
18                                 (779) 772-8309

19

20

21

22

23

24

25
```

1       (The following is from a tape-recording of proceedings:)

2          THE CLERK:  Calling 12 CV 50297, Adams v. Cullinan.

3          MS. CHAIKEN:  Good morning, your Honor.  It's nice to

4  meet you in person.  Tal Chaiken for the plaintiff, Byron Adams.

5          THE COURT:  Good morning, Ms. Chaiken.

6          MS. CAMPBELL:  Good morning again, your Honor.  Bethany

7  Campbell on behalf of Dr. Cullinan.

8          THE COURT:  Good morning, Ms. Campbell.

9          All right.  Ms. Chaiken, I've read both motions and the

10  exhibits.  Is there anything you want to add?

11         MS. CHAIKEN:  Your Honor, on the motion to compel

12  Correctional Healthcare Companies, I would just add that these

13  are extremely targeted requests.  There are four specific

14  policies and their accompanying forms that we know exist and

15  that we know we don't have for the entire time period of

16  Mr. Adams' incarceration.  For the court's convenience, I've

17  prepared a chart showing what has been produced and what has not

18  been produced, if I could tender it.

19         THE COURT:  Sure.  And does Ms. Campbell have a copy?

20         MS. CHAIKEN:  I e-mailed it.  I have another copy here,

21  though.

22         THE COURT:  Okay.

23         MS. CHAIKEN:  As you can see, it shows the specific

24  protocols and forms that we know to exist that relate

25  specifically to the issues in this case.  Diabetes, special

 1    diets, and medication.  They're very specific requests.  And at

 2    Dr. Cullinan's deposition, he made it clear that he did not

 3    think the policies that were dated in the middle of the time

 4    period applied to the earlier parts of the time period.

 5          So, we're at a loss to be able to develop testimony and

 6    facts related to that earlier time period without policies

 7    covering the whole time period, and we've been told for two

 8    months that the client is diligently looking for the documents,

 9    but thus far we haven't received anything.  So, we need the

10    court's help getting those documents.

11          THE COURT:  All right.  What's up with the --

12          MS. CAMPBELL:  Well, there's a --

13          THE COURT:  At this point we're talking about the

14    motion to compel on the corporation.

15          MS. CAMPBELL:  Correct.  Well, your Honor, there's a

16    few things, one of the things being that CHC was acquired by CCS

17    in October of this past year.  In September, just prior to that,

18    the woman that was handling this went on a maternity leave.

19    Last week she just came back from maternity leave.  The

20    gentleman that was taking over her cases and was handling

21    everything did everything he could.  He was part of CCS and not

22    CHC.  So, he produced everything he believed to exist following

23    his search.

24          Since her return, yesterday late afternoon she did

25    produce the rest of the documents that she says is the totality

1    of what they have, and they do cover some of these policies

2    listed here on this chart.

3            THE COURT:  But not all of them?

4            MS. CAMPBELL:  Well, one of them being that this

5    May 1st, 2009, J-02, I actually went to Lee County Jail and

6    produced everything that they have there.  Page 2 from May 1st,

7    2009, does not exist, either with the corporation or out at the

8    jail.  Aside from that, I believe everything else should be

9    covered.  I haven't looked at it in great deal.

10           THE COURT:  Let me pause you right there.

11           MS. CAMPBELL:  I'm sorry.

12           THE COURT:  The May 1st, 2009, it's a protocol, right?

13           MS. CAMPBELL:  Right.

14           THE COURT:  So, it's a form.

15           MS. CAMPBELL:  Correct.

16           THE COURT:  It's a policy from the company.

17           MS. CAMPBELL:  Right.  We have the different versions

18    of it, but the May 1st, 2009, Page 2 does not exist.

19           THE COURT:  Is Page 2 on the back side of a double

20    sided copy?

21           MS. CAMPBELL:  No.  Unfortunately, your Honor, that

22    would be wonderful if it was.

23           MS. CHAIKEN:  Your Honor, if I could just respond to

24    that.

25           THE COURT:  Sure.

1        MS. CHAIKEN:  According to CCS's website, they're a

2   company with 11,000 employees that operates in 38 states.  The

3   suggestion that these corporate documents don't exist in a

4   company of that size --

5        THE COURT:  Yeah, I'm baffled by that.  I mean, even if

6   DOC said that, I wouldn't buy it.

7        MS. CHAIKEN:  The suggestion that there's one person

8   who knows where these documents are that's been on maternity

9   leave is just unbelievable to us.  And because defendant's

10  counsel is representing CHC and CCS, we've obviously been unable

11  to talk to anybody in-house, and when I've communicated with

12  Ms. Campbell about the request, she's told me:  I sent them the

13  request.  That's all I can do.

14       So, I don't know what they've been diligently looking

15  for, but it's just unbelievable to us that these corporate

16  documents don't exist.  The place to find them would not be at

17  the Lee County Jail.  It would be with the corporation.  It's

18  their documents.  And these are -- they're critical documents.

19  These are very targeted requests.

20       And beyond that, we've been asking for deposition dates

21  for the person who signed the responses to the subpoena for over

22  two months.  We first asked for dates on November 3rd.  We were

23  told we would get dates, and we still haven't gotten dates.  So,

24  we've been unable to explore what they've been looking for and

25  why they can't find it.

1          THE COURT:  All right.  So, let's just stick with the

2     documents for a minute.  Ms. Campbell, are you telling me

3     that -- let's go through this document that's been provided --

4     that the policy F-02, October 1st, 2009, version that's been

5     provided to you and can be produced.

6          MS. CAMPBELL:  Well, your Honor, I received an e-mail

7     that stated everything that it was, and I looked at them.  I

8     didn't look at it in great detail preparing for today.  Again,

9     they told me -- they assured me yesterday, they said they could

10    sign an affidavit stating that they have produced everything

11    that the company has regarding these policies.

12         THE COURT:  Okay.

13         MS. CAMPBELL:  The other issue --

14         THE COURT:  No.  That's an I don't know.

15         MS. CAMPBELL:  Well, if it's specifically that date, I

16    mean, I can look at it.  I have it here with me.  I just, you

17    know --

18         THE COURT:  Because I'm going to go through each one of

19    these documents, and we're going to find out whether they were

20    produced to you.

21         MS. CAMPBELL:  Well, one of the issues, your Honor, is

22    the corporation assured me that it was from June 23rd, 2009.

23    However, when I looked at the document they sent me, it says to

24    see the cover page, which they did not send me.  So, quite

25    honestly, I believe this is the June 23rd, 2009, but as I looked

1    at it preparing for this and their office was closed, I can't

2    verify that it's, in fact, June 23rd, 2009, but that's what I

3    was told.

4            THE COURT:  Let me ask you.  Where's the June 23rd,

5    2009, date coming from?  What's the significance of that date?

6            MS. CAMPBELL:  That is what the company sent me an

7    e-mail stating that that was what the policy was from.  However,

8    if you look at the policy, the effective date says to see the

9    cover page.  So --

10           THE COURT:  Okay.  But what I'm saying -- I'm looking

11   at this document that's been provided to me, and I don't see

12   June 23rd as a key day on anywhere.  So, that's why when I hear

13   a specific date, it causes me some confusion.

14           MS. CAMPBELL:  Right.  Well, I'm not sure where counsel

15   got the April 1st, 2009, version.  I was told by the company

16   that it was June 23rd, 2009.

17           THE COURT:  Okay.

18           MS. CAMPBELL:  You know, so unfortunately --

19           THE COURT:  Back up.

20           MS. CAMPBELL:  Okay.

21           THE COURT:  I do things really simple.

22           MS. CAMPBELL:  Okay.  Okay.  I'm sorry.

23           THE COURT:  What I'm asking about -- we've talked a

24   little bit about the May 1st, 2009, version that's missing

25   Page 2.

1          MS. CAMPBELL:  Correct.

2          THE COURT:  And the company doesn't -- claims it

3   doesn't have a copy of its own policies, a complete copy of its

4   own policies.  So, we're moving on from that, and I'm talking

5   about the October 1st, 2009, version of policy F-02.

6          MS. CAMPBELL:  Okay.  I'm sorry.  I jumped ahead.

7          THE COURT:  You said you got documents from your

8   client.

9          MS. CAMPBELL:  Correct.

10         THE COURT:  And I'm asking do you have it that you can

11  give it to the plaintiff.

12         MS. CAMPBELL:  Yes.  We would like just a few days to

13  go through them and verify all the information.  Because, as I

14  said, we have the page, but --

15         THE COURT:  Before we all do that --

16         MS. CAMPBELL:  Yes.

17         THE COURT:  -- do you have that document, this

18  October 1st, 2009, version of policy F-02?

19         MS. CAMPBELL:  Yes, your Honor.  And we actually --

20  that is one of the ones we actually did previously produce from

21  October 1st of 2009.

22         MS. CHAIKEN:  Your Honor, if I could just briefly

23  explain.  This is a dispute that we've been having this entire

24  time in this case, and if I could just briefly explain what I

25  think Ms. Campbell is referring to.

1          THE COURT:  Yes.

2          MS. CHAIKEN:  If I could tender this copy.  May I

3     approach?

4          THE COURT:  Okay.

5          MS. CHAIKEN:  As you can see in the top right corner of

6     that policy, it lists an effective date of October 1, 2009, but

7     then it lists a revision date of -- I believe 2012 is on that

8     version.  So, that tells us that what we're holding is the 2012

9     version, not the 2009 version.  And what we're after is that

10    version as it appeared on October 1st, 2009, so that we can

11    avoid any claim by Cullinan or anyone else that the policy

12    looked differently in 2009, which is what he said at his

13    deposition, that he doesn't know what the earlier version looked

14    like.

15         THE COURT:  Right.  There should be a document that

16    says effective 10-1-009 or a revision 10-1-009 with an effective

17    date prior to that.

18         MS. CHAIKEN:  Right.  So, when she says that they've

19    produced it, I think she's referring to that document that

20    shows --

21         THE COURT:  Is this the same document that they sent

22    you?

23         MS. CAMPBELL:  No, they sent me other ones.  That is

24    one of the ones that we had that we have previously produced.

25         The other thing, your Honor, is a lot of these policies

1    refer to a diabetic diet and the ordering of such and the inmate

2    being given the diabetic diet.  No one is disputing a diabetic

3    diet was not ordered.  Dr. Cullinan has stated, "I didn't order

4    the diet."  So, therefore, there was no diet to be given because

5    he states he didn't order it.  So, a lot of these policies have

6    to do with whether the jail would or would not give a diabetic

7    diet if one was ordered, and he's already stated and there's no

8    dispute that he did not order a diabetic diet.

9              THE COURT:  Okay.  Well, you're talking about relevance

10   at this point, right?

11             MS. CAMPBELL:  Okay.  Well, to some extent, but, you

12   know, if the company's attesting that they have given us

13   everything they have --

14             THE COURT:  Well, it sounds like they've been saying

15   that for awhile now, and all of a sudden you're getting things

16   when somebody comes back from maternity leave that causes me

17   some pause.

18             MS. CAMPBELL:  Well --

19             THE COURT:  Let me finish.

20             MS. CAMPBELL:  Okay.

21             THE COURT:  And that gives me some concern that what

22   was sent before may not be so accurate.

23             MS. CAMPBELL:  Well, I appreciate that, but he attested

24   that he had produced everything that he could find or was aware

25   of, and as she's come back to the office now --

1                 THE COURT:  Who is he?

2                 MS. CAMPBELL:  Brian Hamilton.

3                 THE COURT:  Okay.

4                 MS. CAMPBELL:  And the other one is Sarah Thomas.  And

5     now she has come back to the office.  That's the one who was on

6     maternity leave.  She said she would sign an affidavit.  She's

7     willing to be deposed that this is all the documents that they

8     possess.

9                 THE COURT:  All right.  The ones that you just got that

10    Ms. Chaiken hasn't seen yet.

11                MS. CAMPBELL:  Correct.  Correct.  And I got those late

12    afternoon yesterday.

13                THE COURT:  So, let's go back to where I keep starting.

14                MS. CAMPBELL:  Okay.

15                THE COURT:  All right?

16                MS. CAMPBELL:  Okay.  Sure.  I'm sorry.

17                THE COURT:  So, we're talking about the October 1st,

18    2009, version.

19                MS. CAMPBELL:  Correct.

20                THE COURT:  They have this document, what's been handed

21    me, that has an effective date 10-1, 2009, revision 7-31, 2012.

22                MS. CAMPBELL:  Correct.  I'm sorry.  Your Honor.

23                THE COURT:  There's another one that they need and

24    want.  Do you have that?

25                MS. CAMPBELL:  Correct.  I'm sorry.  I printed out her

1    e-mail that listed everything, and now I can't seem to locate

2    it, if you'd just give me a moment.  I'm sorry.  A gazillion

3    documents and never the one you need.  That's why we're here, I

4    guess.

5        (Brief pause.)

6        MS. CAMPBELL:  Okay.  This is easier.  F-02.  They have

7    produced to me yesterday a policy that was effective June 23rd,

8    2009, and that was effective July 15th, 2011, along with the

9    other policy that we had produced to them.

10        THE COURT:  June 23rd you said or 21st?

11        MS. CAMPBELL:  23rd, 2009, your Honor.

12        THE COURT:  2009?

13        MS. CAMPBELL:  Yes.

14        THE COURT:  Okay.

15        MS. CHAIKEN:  If I could just ask a question.  I

16    thought I heard counsel say June 23rd, 2009, but revised in

17    2011, which causes the same problem.

18        MS. CAMPBELL:  No, no, no.  I'm sorry.  Then another

19    one that was effective July 15th, 2011.

20        My dilemma, your Honor, is again that this what I

21    believe to be June 23rd, 2009, says to see the cover page under

22    the effective date.  I can show it to you.  So, I need to

23    confirm with my client that -- I mean, I'm making an assumption

24    that that is what it is because that's what was sent to me.

25    However, I'm not sure why this one would be done this way and

1    the other ones are not done that way.

2              THE COURT:  Okay.  Then they're asking for any version

3    that applied in September of 2009.  Are you saying that those

4    documents that you received would be responsive to that?

5              MS. CAMPBELL:  Yes.

6              THE COURT:  Okay.  And you're going to be able to

7    provide these to the plaintiff within -- by the end of the week?

8              MS. CAMPBELL:  Absolutely.

9              THE COURT:  Let's go to Form 00072, an April 1st, 2009,

10   version.  Do you have that?

11             MS. CAMPBELL:  Yes.  It was produced yesterday.

12             THE COURT:  Provided to you yesterday.

13             MS. CAMPBELL:  Correct.  Yes.  I'm sorry.  You're

14   correct.  I'm sorry.

15             THE COURT:  All right.  And then any other version that

16   applied from September '09 to December 2012, do you have those?

17   Did they provide those to you?

18             MS. CAMPBELL:  We have the one from April 1st, 2009,

19   and then the one that we have previously produced to the

20   plaintiff with the revision dates.

21             THE COURT:  When you say the one previously produced,

22   is it this document that was handed to me?  No, that's October.

23             MS. CAMPBELL:  No.

24             MS. CHAIKEN:  If I could tender it, your Honor.

25             THE COURT:  Sure.

1          MS. CHAIKEN:  There's a form that would have expressly

2     allowed Dr. Cullinan to prescribe a diabetic diet.  The version

3     that we received was 2013.

4          THE COURT:  Right.

5          MS. CHAIKEN:  And so, if counsel's representation is

6     that the April 1, 2009, version would have applied all the way

7     from 2009 to 2013, we don't know if there were any other

8     revisions.  That's why the chart just asks for any other

9     documents.

10          THE COURT:  Okay.

11          MS. CHAIKEN:  We obviously don't know what we don't

12     have.

13          THE COURT:  Right.  Okay.  And so, if there are

14     documents, you have those, and they'll be provided?

15          MS. CAMPBELL:  Yes, your Honor.

16          THE COURT:  Okay.  Policy G-01.  Any version that

17     applied from September 2009 to July 15th, 2011.

18          MS. CAMPBELL:  Again, your Honor, I was -- our client

19     sent to us yesterday one that they state's effective June 23rd,

20     2009, and again under the effective date it says to see the

21     cover page.  So, again I'm making a bit of a leap that that is

22     truly what it is.  I have to verify with my client.

23          THE COURT:  All right.  Form 00077, accompanies the

24     policy.  April 1st, 2009.  Do you have that?

25          MS. CAMPBELL:  Yes, your Honor.

```
1              THE COURT:  Okay.  And that will be provided to the
2    plaintiff?
3              MS. CAMPBELL:  Yes, your Honor.
4              THE COURT:  Okay.  And then any version that applied
5    between September '09 to December '12.
6              MS. CAMPBELL:  That's correct.
7              THE COURT:  Policy D-02.
8              MS. CAMPBELL:  Again, your Honor, I have from my client
9    that is effective June 23rd, 2009, and again the effective date
10   says to see the cover page.  So, again I'm making that leap that
11   that, in fact, is what it is, but I need to confirm with them.
12             THE COURT:  Okay.  And where are they?  Who sent you
13   the e-mail?
14             MS. CAMPBELL:  They're in Nashville.
15             THE COURT:  Okay.  So, they're Central Time.
16             All right.  I've got an 11:00 o'clock call on a
17   criminal case.  Before you folks leave the Stanley J. Roszkowski
18   United States Courthouse building, you probably should call your
19   client to make sure -- see what the cover page says, so that if
20   there is an issue, you can walk back in after my criminal call,
21   and we can resolve anything else that's outstanding.
22             MS. CAMPBELL:  Absolutely.
23             THE COURT:  Next document, Form 15 and FDA 3500.  Do
24   you have that document?
25             MS. CAMPBELL:  Yes, your Honor.
```

1           THE COURT:  Okay.  And that will be produced.

2           All right.  That goes through the documents.  You're

3     going to check with your client to make sure that everything

4     that has been provided to you very recently is the totality of

5     all the documents that have been requested that are relevant.

6     The court will find that.

7           The court will make a report and recommendation that

8     Page 2 of Clinical Protocol J-02 will be produced by January

9     19th, 2015, 5:00 o'clock Central Time.  If it's not produced, an

10    adverse inference will be drawn from the failure to produce that

11    page, and I'll do a report and recommendation to that effect,

12    and you'll have 14 days to file any objection to that.

13          One other issue regarding the motion to compel

14    regarding Correctional Healthcare Companies, deposition of Brian

15    Hamilton.  When can he be deposed telephonically?

16          MS. CAMPBELL:  Well, your Honor, we would -- quite

17    honestly, the deposition of Brian Hamilton would be a waste of

18    everyone's time.

19          THE COURT:  They don't seem to think so.

20          MS. CAMPBELL:  Well, I can appreciate that.  However,

21    you know, because this Ms. Thomas is back, I mean, quite

22    honestly, she worked for CHC.  She's the one that's going to be

23    the most knowledgeable.  I mean, it just -- if that's what

24    they're trying to get to the heart of the matter, then she would

25    be the person that they would speak to, not Mr. Hamilton.  But

1    she was not back from maternity leave and could not be

2    contacted.  Therefore, that's why Mr. Hamilton was taking care

3    of things versus Ms. Thomas.

4            THE COURT:  Do you want Mr. Hamilton or Ms. Thomas?

5            MS. CHAIKEN:  If their representation is that

6    Ms. Thomas is more knowledgeable, that's fine.  I mean,

7    Mr. Hamilton is the person who attested to the responses, and

8    there appear to be several issues with some of the responses.

9    So, if she's going to be familiar and knowledgeable with the

10   responses and with the documents, that's fine with us.

11           THE COURT:  What I don't want happening -- he signed

12   off on this.  I don't want Ms. Thomas coming in saying, "Well, I

13   don't know why he signed that.  That's wrong.  That's not -- oh,

14   he should have checked here."  I suppose that's good and bad in

15   a way for you, but it's going to delay discovery.  It's going to

16   result in additional motions, including probably motions for

17   sanctions.

18           So, produce the person most knowledgeable about the

19   documents produced in the discovery responses.  And when can

20   that deposition occur?

21           MS. CAMPBELL:  Will that be telephonically, as well?

22           THE COURT:  That's what they're asking for.

23   Telephonic, right?

24           MS. CHAIKEN:  Yes, your Honor.

25           MS. CAMPBELL:  I believe we should be able to make it

1    work within the time frame that was on the motion, the 19th to

2    the 21st next week.

3            THE COURT:  Okay.

4            MS. CAMPBELL:  I can confirm that with her today on the

5    phone.

6            THE COURT:  That deposition will occur between January

7    19th, 2015, and January 21st, 2015.  Okay?

8            That resolves the motion to compel regarding

9    Correctional Healthcare Companies?

10           MS. CHAIKEN:  It does, your Honor, to the extent we

11   know what's out there.  This is something we're going to have to

12   explore in the deposition.

13           THE COURT:  Yep.  Yep.

14           MS. CHAIKEN:  With respect to the lawsuits, your Honor,

15   this is something that we've tried to obtain through

16   interrogatories to the defendant, document requests to the

17   defendant, a subpoena to his employer, and deposition

18   questioning of Dr. Cullinan, and we haven't gotten anywhere.

19           We are interested in receiving sworn statements that

20   he's given in the past.  What we have found so far that's been

21   publicly filed on Pacer has been astonishing, as far as what the

22   defendants have said under oath and used to obtain summary

23   judgment in the past that is diametrically opposed to the sworn

24   testimony he's given in this case about the treatment of

25   diabetes.  That tells us that there's bound to be more out

1   there.  And they've never worked with us on getting any of this

2   information.

3           And to make matters worse, when I asked Cullinan in his

4   deposition whether he had ever been represented by Mr. Vogt in

5   the past, he said, "Not that I can recall," and Mr. Vogt shook

6   his head in agreement right next to him.  And then I asked him

7   if he had ever been represented -- or if he had ever been sued

8   by a diabetic inmate other than Mr. Adams, and he said, "Not

9   that I could recall."  And what we found out is that Mr. Vogt

10  has previously represented him in connection with a lawsuit by a

11  diabetic inmate, and to this day we still have not gotten a

12  single piece of information related to that lawsuit and --

13          THE COURT:  Okay.  Let me pause you there.

14          What's the problem with producing those?

15          MS. CAMPBELL:  Well, your Honor, I believe that that

16  lawsuit is from 2004, 2005.  We don't have those records anymore

17  in our office.

18          THE COURT:  Where would they be?

19          MS. CAMPBELL:  Truthfully, I don't know the answer to

20  that question, your Honor.

21          THE COURT:  All right.  Well, Rule 34 requires parties

22  to produce documents in their possession, custody, or control,

23  which there's reams of cases that talk about current and even

24  former attorneys' documents and files are within the possession,

25  custody, and control of the client.

1          So, they've been asking for it for awhile.  Mr. Vogt

2    apparently represented Dr. Cullinan in that case involving

3    diabetes previously.  You're here.  He's not.

4          MS. CAMPBELL:  I think I misspoke.

5          THE COURT:  Now, that's -- now, don't -- you keep

6    interrupting me.

7          MS. CAMPBELL:  I'm sorry.

8          THE COURT:  Probably not the best practice to send you

9    to cover this case.  It probably should have been somebody else

10   who's had a history with the case.  You're standing before me,

11   so there's only so much fire I can send your way, but I'm not

12   too pleased.

13         MS. CAMPBELL:  I appreciate it.  Mr. Vogt would have

14   been here, but he's starting trial today in Cook County.

15         THE COURT:  Okay.  Well, I mean, the correspondence

16   goes back months.  So, at some point there's going to be --

17         MS. CAMPBELL:  Right.  Right.  It's my understanding

18   from what Mr. Vogt has told me that the records regarding that

19   lawsuit, we do not possess them, we don't control them, we just

20   don't have them anymore.

21         THE COURT:  Okay.  What was done to locate them?  Are

22   they in Iron Mountain in a cave somewhere?  I mean, that's what

23   Iron Mountain is.  It's a giant cave, and people put documents

24   in it.

25         MS. CAMPBELL:  Okay.  Correct.  You're right.  I know

 1    they're not in our office.  As far as whether Iron Mountain, I

 2    do not -- I'm not aware that we sent any documents there, but

 3    that doesn't mean that that doesn't happen.

 4           THE COURT:  Where does the firm send its client files

 5    when they're off-site?

 6           MS. CAMPBELL:  Truthfully, I don't know, your Honor,

 7    but I will find out today.  But I've been told by -- that we

 8    don't have them.

 9           MS. CHAIKEN:  Your Honor, if I could just --

10           THE COURT:  Not having them and them being in your

11    possession, custody, and control are two very different issues.

12           MS. CAMPBELL:  Correct.

13           THE COURT:  So, if they send them off-site and they're

14    at some storage facility somewhere, they're in the control.

15           MS. CAMPBELL:  Correct.

16           THE COURT:  And they need to get them to the plaintiffs

17    by January 19th.

18           MS. CAMPBELL:  Okay.

19           MS. CHAIKEN:  I was just going to add, your Honor, that

20    in my conversations with Mr. Vogt, he's always taken the

21    position that Cullinan doesn't know and doesn't have any

22    documents in his possession.  And when I've expressed to him

23    that our understanding of Rule 34 is possession, custody, or

24    control, he said:  I disagree with you on that, and we're not

25    going to give you -- we're not going to call anyone or make any

1    effort to get documents that he doesn't possess or doesn't know

2    about.

3            THE COURT:  Okay.

4            MS. CHAIKEN:  Mr. Cullinan has other pending lawsuits

5    right now in which he's represented by Heyl Royster, who we

6    understand represented him in a lot of former cases.  And so,

7    it's not even an issue of former attorneys.  It's an issue of

8    current attorneys that he could easily call and say:  Can you

9    send me the sworn statements I've given in cases in the past.

10   And I just don't see --

11           THE COURT:  Let Mr. Vogt know that Rule 34 requires a

12   reasonable investigation.  Calling up Heyl Royster and saying,

13   "Give me your Cullinan files," that's well within a reasonable

14   investigation.

15           MS. CAMPBELL:  Can I tell your Honor what we did do?

16           THE COURT:  Tell me.  Sure.

17           MS. CAMPBELL:  We did do a Pacer search, and for

18   everything under Steven C, which included Steven with a PH,

19   Steven with a V, S. Cullinan, Steven Cullinan with a V M.D., and

20   produced I believe almost 800 pages of documentation related to

21   a complaint and the disposition of those lawsuits.

22           THE COURT:  Okay.

23           MS. CAMPBELL:  So, it's not, you know --

24           THE COURT:  But did you look at who represented

25   Mr. Cullinan and call the attorneys?  Because that would have

1    been an easy step and a reasonable step.

2              MS. CAMPBELL:  No, because some of the cases are from

3    1999.  I mean, some of them are very old.  They're not even on

4    the Pacer.  It's just a docket.

5              THE COURT:  I mean, but the attorney's names, right?

6    You have the attorney's names?

7              MS. CHAIKEN:  Your Honor, they made this production

8    yesterday for the first time in six months since we had sent the

9    request.  Seven months, actually.  And that Pacer docket search

10   didn't even include the information about the lawsuit that's on

11   Pacer in which Mr. Vogt represented Cullinan.

12             So, we already told them that we've done -- we've

13   pulled what's publicly available.  They duplicated our work.  I

14   don't know why.  Because I already told Mr. Vogt the things that

15   come up when I search Cullinan comma Steven, I don't need you to

16   give me that.  I have those complaints.  I've pulled those

17   documents.  But anything that's not publicly available, we don't

18   have.  And given what is publicly available, there's bound to be

19   more that's going to be admissible and highly relevant to this

20   case.

21             THE COURT:  Tell Mr. Vogt that -- well, don't tell

22   Mr. Vogt.  The court will order the defendant to contact

23   Mr. Cullinan's current and former attorneys I'll say from --

24   what's your time frame of the document request?

25             MS. CHAIKEN:  There wasn't a time frame put on it.  You

1    know, we --

2         THE COURT:  Okay.  January 1st, 2005, to the present.

3    And produce those to you, to be produced to the plaintiff.  If

4    there's attorney-client or work product, if there's notes,

5    attorney notes in there, create a privilege log.  But deposition

6    transcripts, that shouldn't be a problem.  And that's what

7    they're looking for is interrogatory answers and dep

8    transcripts, right?  That's what you want.

9         MS. CHAIKEN:  And affidavits.

10        THE COURT:  And affidavits in support of summary

11   judgment.

12        MS. CAMPBELL:  Just to be clear, your Honor, what I'm

13   requesting from these attorneys is limited to those three

14   things?

15        THE COURT:  No.  Any statements by Dr. Cullinan.  All

16   right?  So, obviously, if you make statements, if there's

17   attorney's handwritten notes or notes in a file with, you know,

18   an attorney interviewing, that's going to be attorney-client

19   privilege.  Put it on a privilege log.  But clearly what they're

20   looking for is affidavits, interrogatory answers, and dep

21   transcripts.

22        MS. CHAIKEN:  Your Honor, we do have a couple of other

23   issues that were not subject of a motion that have come up since

24   last --

25        THE COURT:  Are we done with the motion relating to

1   responses to interrogatory and production requests?  Are we done

2   with that?

3              MS. CAMPBELL:  Can I have just one question, your

4   Honor?

5              THE COURT:  Sure.

6              MS. CAMPBELL:  You had -- I'm just not clear on when

7   this production, when you want that completed.

8              THE COURT:  I'll give you to January 26th.

9              MS. CAMPBELL:  Your Honor, I appreciate the extension

10  to January 26th.  Is there any way we can get any -- I mean,

11  there's -- I mean, as counsel has said, there's a lot of

12  lawsuits, quite honestly.

13             THE COURT:  Yeah.

14             MS. CAMPBELL:  Well, I'm just -- I mean, I'm just

15  asking -- I understand --

16             THE COURT:  You're in a very awkward position --

17             MS. CAMPBELL:  Correct.

18             THE COURT:  -- that someone else has put you in.

19             MS. CAMPBELL:  Yes.

20             THE COURT:  You know there's a lot of lawsuits.

21             MS. CAMPBELL:  Right.

22             THE COURT:  They know there's a lot of lawsuits.

23             MS. CAMPBELL:  Right.

24             THE COURT:  I know there's a lot of lawsuits.

25             MS. CAMPBELL:  Right.

1          THE COURT:  Which means that this process should have

2     started months ago, not now.

3          MS. CAMPBELL:  Okay.

4          THE COURT:  All right.

5          MS. CAMPBELL:  I appreciate that.  I just --

6          THE COURT:  I'll give you 'til the 30th.

7          MS. CAMPBELL:  Okay.

8          THE COURT:  January 30th.

9          MS. CAMPBELL:  If you don't ask, you can't get it.

10         THE COURT:  And that's a firm date.

11         Are we done with the motion to compel defendant's

12    response to interrogatories and production of documents?

13         MS. CHAIKEN:  Yes, your Honor.  Although, I suppose

14    we'd ask if it could be continued so that we can check in on the

15    status of the production in case we don't get those documents so

16    that we don't have to file another motion.

17         THE COURT:  You can file -- I'm not going to enter and

18    continue it.  You see what you get.  You can file a new motion,

19    and we'll go through the process again.

20         MS. CHAIKEN:  Okay.

21         THE COURT:  Obviously, if you have to file a new

22    motion, that's going to cause some additional problems.  Okay?

23         MS. CHAIKEN:  Yes.

24         THE COURT:  Okay.  So, anything else?

25         MS. CHAIKEN:  Yes, your Honor.  On December 29th we

1   received supplemental disclosures from the defendant that listed

2   14 individuals.  It included several of Mr. Adams' treating

3   physicians.  And at that time we --

4          THE COURT:  Hold on one second.  Just pause you right

5   there so I can get a document and follow along with you a little

6   bit better.

7          MS. CHAIKEN:  Okay.

8      (Brief pause.)

9          THE COURT:  Okay.  Start back where you started.

10         MS. CHAIKEN:  Okay.  On December 29th of last year, we

11  received supplemental disclosures from the defendant listing 14

12  individuals that may have knowledge.  It listed I think it was

13  nine treating physicians, and at that time we communicated with

14  defendant's counsel to let them know that we object to any

15  ex parte contact with Mr. Adams' treating physicians as in

16  violation of the physician-patient privilege.  We also wanted to

17  avoid having to depose 12 or 13 people that haven't been deposed

18  in this case.  And so, we proposed exchanging anticipated trial

19  witness lists so that we could keep the depositions to a

20  minimum.

21         Last Friday we were informed that the defendant intends

22  to call two witnesses that have not yet been deposed.  That's

23  Dr. Dan Williams, who's a doctor at the Lee County Jail, and

24  Doug Carlson, who's the former jail superintendent of the Lee

25  County Jail.

```
1            THE COURT:  And when were they first identified?

2            MS. CHAIKEN:  We first received it on December 29th.

3    We had identified them in our disclosures because, as the court

4    knows, when we were appointed, we had initial disclosures due

5    relatively soon after.

6            THE COURT:  Okay.

7            MS. CHAIKEN:  So, we --

8            THE COURT:  So, you had those two names.

9            MS. CHAIKEN:  We knew that they existed, but they had

10   never been --

11           THE COURT:  Okay.

12           MS. CHAIKEN:  We had had conversations with them, and

13   we had asked in interrogatories who they intended to call at

14   trial, and they had never given any indication that they might

15   be witnesses.  And so, we didn't know that.

16           I've communicated with Dr. Williams.  His deposition is

17   scheduled for Friday, this Friday, here in Rockford.  The issue

18   that we need the court's help with is Ms. Campbell has now

19   informed me that her law firm is planning to represent

20   Mr. Williams, which I think causes a lot of issues with the

21   physician-patient privilege of having a defendant's attorney

22   representing a patient's treating physician.  It seems to be at

23   odds with the whole idea, and it puts his interests represented

24   by the defendant's attorneys squarely at odds with our client's

25   interests.
```

1          THE COURT:  Is there a rule of professional conduct

2     that would bar that?

3          MS. CHAIKEN:  Well, there's a rule that bars defense

4     attorneys from communicating with patient's treating physicians.

5          THE COURT:  Are you talking about the Petrillo

6     doctrine?

7          MS. CHAIKEN:  Yeah, and we've seen federal court cases,

8     including one from a judge in this district, holding that it

9     applies in several courts.

10          THE COURT:  Western Division?

11          MS. CHAIKEN:  Yes.

12          THE COURT:  Okay.  There's cases that say Petrillo does

13     not apply in the Northern District, too.  All right?

14          MS. CHAIKEN:  Yeah.  The most recent case I've seen --

15     I'm going to apologize in advance if I say the wrong name, but I

16     believe it's Maloney.

17          THE COURT:  Mahoney?

18          MS. CHAIKEN:  Mahoney?  Okay.  I'm sorry about that.  I

19     believe it was his case, and I believe actually one of those

20     cases involved Mr. Vogt's law firm, although I may be mistaken

21     on that because I'm going from memory.  This is -- the first

22     I've heard of it was this morning right before the hearing, so I

23     haven't been able to research the issue.

24          But if the court -- you know, if the court thinks that

25     that's fine, then we obviously will go along with that, but we

1    felt the need to raise it.  It seems to be a little bit

2    problematic.

3            THE COURT:  You know, it's kind of their choice.  If

4    they want to represent the doctor in his deposition and it turns

5    out that that's completely improper under the Petrillo doctrine

6    and the Petrillo doctrine applies in the Northern District of

7    Illinois and there would be consequences to that, well, that's

8    kind of their choice.  They're on notice of the problem or

9    potential problem, and they can choose.  It's also good

10   impeachment material for you, isn't it?

11           MS. CAMPBELL:  Well, yeah.  They've been representing

12   most of the third-parties in this case.  So, can we just go on

13   record as reserving our rights to seek appropriate relief

14   related to their representation?

15           THE COURT:  You always have the right to seek

16   appropriate relief.  If it turns out to be a problem, you can

17   file a motion.

18           MS. CHAIKEN:  Okay.  And then Mr. Carlson is the second

19   witness.  He's the former assistant warden.  Again, we learned

20   that he was going to be called as a trial witness on Friday.  I

21   spoke with the attorney who represents the Lee County Jail on

22   Friday.  We e-mailed on Saturday, and I spoke to him yesterday

23   and again today.  The Lee County Jail is still trying to

24   determine whether Mr. Carlson, who's now retired, is going to be

25   represented by Mr. Moore, who I've been in touch with, or by the

```
 1    State's Attorney's Office.

 2              THE COURT:  Patrick Moore?

 3              MS. CHAIKEN:  Yeah.

 4              THE COURT:  Okay.  Sometimes he's in here.

 5              MS. CHAIKEN:  I spoke with him this morning.  He told

 6    me that they still haven't decided who is going to represent him

 7    and that he believes that Mr. Carlson is out of state on

 8    vacation, but he's not sure.  It's looking increasingly unlikely

 9    that we're going to be able to get that deposition done before

10    the close --

11              THE COURT:  Discovery will be extended to depose

12    Mr. Carlson.

13              MS. CHAIKEN:  Okay.

14              THE COURT:  Mr. Moore is easy to work with.  So, he

15    won't play games with you.

16              MS. CHAIKEN:  That's the sense I've gotten.  So, we

17    just wanted to ask for just extra time for that deposition.

18              THE COURT:  That will be allowed.  Mr. Carlson's

19    deposition can be taken after the close of discovery, fact

20    discovery.

21              Okay.  Anything else?

22              MS. CHAIKEN:  That's it from the plaintiff, your Honor.

23              THE COURT:  All right.  From the defendant?

24              MS. CAMPBELL:  And, well, just with the tasks that are

25    now before me, I would ask if we could extend the deposition of
```

1    Mr. Williams, also, just to try to get all of this information

2    to plaintiff as soon as possible.  You know, they're aware that

3    they want to take Dr. Williams' deposition.  We're here before

4    the court.  We're going to extend it for Mr. Carlson.  If the

5    court could grant that, as well.

6            MS. CHAIKEN:  Your Honor, the witness has already --

7    this was at his request.  He said can we do it on Friday at

8    3:30 in Rockford, and we're accommodating that.  This is -- you

9    know, we were trying to get it done before the close of fact

10   discovery --

11           THE COURT:  And it's Dr. Williams?

12           MS. CHAIKEN:  Yes, Dr. Williams.

13           THE COURT:  Okay.  Is he represented by you?

14           MS. CAMPBELL:  Well, that's --

15           THE COURT:  By your firm?

16           MS. CAMPBELL:  Well, again, with the Sarah Thomas, I

17   found this out yesterday.  I was told that he did not work for

18   us.  I was told yesterday just before the end of business that

19   he, in fact, did.  I've tried to reach out and contact him to

20   confirm.  You know, quite honestly, as I stand here today, I

21   know what Ms. Thomas told me.  I believe what she says to be

22   true, that he, in fact, did work for us at that time.

23           THE COURT:  He didn't seem to have a problem having to

24   sit down with a deposition with the plaintiff.  So, that dep's

25   going.

1          MS. CAMPBELL:  Okay.

2          THE COURT:  Okay.  Let's do a telephonic status.

3          MS. CHAIKEN:  I think we have a status set for the

4     27th.

5          THE COURT:  Of January?

6          MS. CHAIKEN:  Yes, I believe so.

7          THE COURT:  Did Mr. Moore give you any indication on

8     when Mr. Carlson would be back in town?

9          MS. CHAIKEN:  Mr. Moore wasn't sure about that.  Since

10    Mr. Carlson is retired, I don't think the jail really knows

11    where he is.  Mr. Moore gave me three dates in January on which

12    Mr. Moore would be available, and I would be available on those

13    dates, as well.

14         THE COURT:  What are those dates?

15         MS. CHAIKEN:  It's the 23rd, the 27th, and the 30th.

16    But that is all subject to the jail deciding to have Mr. Moore

17    representing the witness rather than the State's Attorney.  I

18    don't know who.

19         THE COURT:  Okay.  I mean, he does a lot of work for

20    them.  So, let's keep it on the 27th at 9:00 o'clock, and we'll

21    see where we are at that point.  Okay?  Then we'll probably have

22    a short status after that.

23         Anything else to take up this morning?

24         MS. CHAIKEN:  Nothing from the plaintiff, your Honor.

25         MS. CAMPBELL:  Your Honor, just to clarify, our status,

1    telephonic status, is the 27th at 9:00 a.m.

2              THE COURT:  Correct.

3              MS. CAMPBELL:  Okay.

4              THE COURT:  Okay?

5              MS. CHAIKEN:  Thank you, your Honor.

6              THE COURT:  Anything else?

7              MS. CAMPBELL:  Thank you.

8              THE COURT:  All right.  Have a good day.

9              MS. CAMPBELL:  Thank you.

10        (Which were all the proceedings had in the above-entitled

11        cause on the day and date aforesaid.)

12        I certify that the foregoing is a correct transcript from

13   the tape-recording of proceedings in the above-entitled matter.

14

15

     _____
16   Mary T. Lindbloom
     Official Court Reporter
17

18

19

20

21

22

23

24

25